J-S13031-19

NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| SHAWN ANTHONY SCHAEFER, | : | |
| | : | |
| Appellee | : | No. 1204 WDA 2018 |

Appeal from the Order Entered July 31, 2018
in the Court of Common Pleas of Elk County
Criminal Division at No(s): 34 of 2018

BEFORE:    BENDER, P.J.E., OTT, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:    FILED MAY 21, 2019

The Commonwealth of Pennsylvania appeals from the order entered on July 31, 2018, which granted in part and denied in part a motion to suppress evidence in a criminal case initiated by the Commonwealth against Shawn Anthony Schaefer.[1]  After careful review, we affirm in part and reverse in part.

At 8:26 p.m. on the evening of April 25, 2017, Christine Delhunty went outside to walk her dog.  She heard "a large whooshing noise" and saw "a fireball … pass[] by all the front windows of" her across-the-street neighbor's house, located at 1454 California Road in Elk County, Pennsylvania (the

_____

[1] The Commonwealth has certified that this order substantially handicaps its prosecution of this case. See Commonwealth's Brief at 1.  Therefore, this order is appealable pursuant to Pa.R.A.P. 311(d).

*Retired Senior Judge assigned to the Superior Court.

Property). N.T., 1/19/2018, at 12. The Property is a log-cabin style house owned by Schaefer and his estranged wife, Monique M. Schaefer. Id. at 3. At that time of the fire, Schaefer and his two children lived at the Property at least part-time. Id. at 63. Delhunty went back inside her house, saw smoke rising across the street, and called 911 at 8:30 p.m.

The fire department arrived at the Property shortly after 8:30 p.m. N.T., 6/20/2018, at 30. By that time, "[t]here was significant damage [to the Property], but [the fire] had pretty much [blown] itself out." Id.

Corporal Greg A. Agosti, a fire investigator with the Pennsylvania State Police, was called upon to investigate the fire around 9:00 p.m. and arrived at the Property just before 11:00 p.m. N.T., 1/19/2018, at 9. Upon entering the Property, Agosti "noticed what [he] thought [was an] irregular fire pattern … that stretched a distance across the living room floor [and] extended into the dining room and into the kitchen." Id. at 14-15. "The fire damage on the [kitchen] countertop led [Agosti] to believe that a fire had originated on the countertop in the kitchen, in the corner near the refrigerator." Id. at 16.

According to Agosti, this "irregular fire pattern" formed due to fuel being put on the fire "to cause the fire to move from one point to another." Id. at 17. Agosti described the fire as a flash fire that spread rapidly, was short in duration, and left extensive smoke and heat damage. To aid in his investigation, Agosti requested the assistance of an accelerant detection

canine. The canine and dog handler arrived around 3:00 a.m. Id. The canine did not alert for any accelerants for which it had been trained. Agosti checked the propane system on the property, including the 500-gallon tank outside. Agosti and the dog handler, who was also a fire investigator, "checked all the pipe fittings that were accessible from the tank down through the appliances for leaks, using air monitoring meters." Id. at 18. They "found no sign of leaks." Id. Notably, Agosti removed a drawer on the range in the kitchen to access the pipe behind the range, and "found no sign of a hazardous environment … [and] no sign of a propane leak." Id. at 19. Agosti believed the fire was "an intentionally set fire, [and that] vapors that were present in the atmosphere were ignited from an open flame, from a candle, on the kitchen countertop." Id. at 66. By the time Agosti left the Property in the early hours of April 26, 2017, he "was convinced it was not a propane leak" that caused the fire. N.T., 6/20/2018, at 33.

In continuance of the investigation, on April 28, 2017, Agosti requested that Hugh Rich, co-owner of Rich Gas, the propane supplier for the Property, perform an inspection of the propane system. Id. at 14. Rich performed a "leak check" on the system, and concluded there "was no leak" in the system (April 28 Leak Check). Id. at 16. By May or June of 2017, Agosti had "formulated the opinion that this was an incendiary fire" and was the result of arson. Id. at 35.

Meanwhile, Schaefer had contacted his home-insurance carrier, State Farm, to report the fire. State Farm secured the Property and began its own investigation. Notably, State Farm secured the Property immediately after the fire and for the next 11 days. Thereafter, the Property was returned to the control of Schaefer, although nobody was able to move back into the Property at that point.

Because Agosti believed the fire was caused by arson, he investigated potential motives, including a financial motive, for Schaefer to set the Property on fire. At the time of this incident, Schaefer and his wife were separated. The Property had been listed for sale 20 days prior to the fire for a sale price of $250,000. The Schaefers had an outstanding mortgage balance of $202,000. State Farm insured the Property for over $450,000. In addition, credit reports for the Schaefers revealed several accounts that were in collection and numerous accounts as past due.

In addition, Agosti investigated Schaefer's actions on the evening of the fire and put together a timeline of Schaefer's activity by tracking the location of his cell phone. At 7:45 p.m., Monique dropped Schaefer off at the property after the two attended their child's baseball practice. At 8:21 p.m., Schaefer called Seth Young from the home. That phone call lasted 4 minutes and 45 seconds. Schaefer and Young then had a 27-second phone call at 8:29 p.m., which was "dropped." N.T., 1/19/2018, at 13. At 8:30 p.m., Schaefer placed a phone call to Young that lasted for 13 minutes, 21

seconds. Surveillance video revealed that Schaefer was driving his car and passed by state police barracks at 8:32 p.m., and he was at a nearby Sheetz from 8:36 p.m. to 8:42 p.m. Id.

Although Agosti believed the fire was caused by arson, and a chemical was used to spread the fire based upon the irregular fire patterns on the carpet and floors, it was not clear what chemical was actually used. As noted, the accelerant detection canine did not alert for any accelerants. Therefore, Agosti investigated products found or used in the home. To do so, Agosti obtained and executed numerous search warrants throughout the summer of 2017.

"On June 28, 2017, [] Schaefer advised [Agosti] that he used Aero Kroil lubricant in an aerosol can on the ceiling fan in the living room a few days prior to the fire. [Schaefer] further explained he used 3M Drywall Corner Bead Adhesive on the floor along the [] side of the living room to glue tiles to the floor." Affidavit of Probable Cause for Search Warrant Issued on 9/8/2017, at 5. Both products are flammable. In addition, Agosti found a can of Raid Wasp and Hornet Killer at the Property. Schaefer explained that he had a problem with carpenter bees tunneling into the Property. Fire debris samples that were collected from the irregular and linear fire patterns revealed the presence of a flammable chemical called naphthalene, a chemical which is found in Raid.

On August 21, 2017, Agosti obtained a search warrant to examine additional carpet samples. According to the affidavit of probable cause attached to that search warrant,

> [n]aphthalene is an uncommon incendiary agent. Special Agent Matthew Regentin, Certified Fire Investigator with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and Chief Donald Brucker, Officer in Charge of the Allegheny County Fire Marshall's Office, will assist with recovery of the living room carpet and further examination, experimentation and testing. Regentin and Brucker have additional training and experience necessary to further understand the fire scene and steps taken by the actor responsible for igniting the fire.

Affidavit of Probable Cause for Search Warrant Issued on August 21, 2017, at 5.

Agosti contacted Schaefer's attorney, Attorney Karl Geci,[2] prior to the August 21, 2017 search, and Attorney Geci appeared for the search conducted that day. While together, Attorney Geci proposed several accidental theories for the fire, including a defective coffee pot. The aforementioned experts took a sample of carpet pursuant to the search warrant and testing revealed high levels of kerosene.

Thus, Agosti obtained another search warrant for September 8, 2017, for the purpose of obtaining unburnt carpet samples for comparison. That

---

[2] Attorney Geci had been retained by Schaefer to assist with the civil-litigation aspects of the fire. Although Schaefer was suspected of arson, he had not yet been charged. Moreover, because the Property was unoccupied, but controlled by Schaefer, Agosti contacted Attorney Geci prior to executing each search warrant, rather than attempt to break down the door to gain entry.

search warrant identified certain items to be seized, including carpet and chemicals. Search Warrant Authorization for 9/8/2017, at 1.

Once again, Agosti contacted Attorney Geci to advise him that he had obtained a search warrant for the Property for that day. Attorney Geci advised Agosti over the phone that Schaefer "had hired an expert[, Richard Hughes,] and Hughes looked at the [P]roperty and opined that the fire was caused by a propane leak." N.T., 6/20/2018, at 41. According to Attorney Geci, the leak was "[i]n the kitchen at the stove." Id. at 42. Attorney Geci told Agosti that "he even had a draft report [(Draft Report)] written by [] Hughes indicating that there was a leak behind the range in the kitchen."[3] Id. at 42-43.

---

[3] By way of background, Hughes and Agosti had an interaction in 2015. According to Agosti, he had some plumbing work done by a contractor in his home, and Hughes was hired by that plumbing contractor as an expert due to a dispute between Agosti and that plumbing contractor. Agosti testified that "Hughes lied to [him] in [his] very own home" and Agosti "called him on it." N.T., 6/20/2018, at 104. Agosti testified that therefore he does not hold Hughes['s] "credibility high." Id. Agosti further stated that there have "been a lot of questions of [] Hughes'[s] credibility in courtrooms in multiple locations and multiple cases." Id. at 105. Alternatively, according to Hughes, he has been an expert for almost 30 years and has looked at 2,000 sites, mostly for insurance companies. Id. at 111. Hughes looked at Agosti's house on behalf of the plumbing company because Agosti believed that "foundation walls had moved" and "the activities of the plumbing contractor may have [been the] cause[]." Id. at 110. While Hughes was performing his inspection at Agosti's home, Agosti asked Hughes for his opinion, and Hughes informed Agosti that he would be giving his opinion to the plumbing contractor, because the plumbing contractor, not Agosti, had hired him. Agosti then threatened to "subpoena" Hughes for his opinion. Id. at 111.

On September 8, 2017, pursuant to the search warrant, Agosti and the other experts collected additional carpet samples.  However, based on this new information about a potential propane leak, Agosti once again contacted Rich and asked him to come to the Property as well.  Information about what happened on September 8, 2017, is somewhat convoluted.  What is clear from the record is that Rich performed a propane leak check on September 8, 2017 (September 8 Leak Check), and Attorney Geci was not present when that check was performed.[4]  The September 8 Leak Check revealed the presence of a leak in the propane connection near the range.  According to Agosti,

> [t]he range was connected to the propane supply by a flexible connection.  The connection could be reached by a human from under the range as the storage drawer of the range was removed.  [Agosti] observed a knife, capable of puncturing the flexible gas connection pipe, positioned next to the range on the countertop.  [Agosti] did not observe the knife at that location during previous examinations.

Affidavit of Probable Cause for Search Warrant Issued on 9/20/2017, at 7.

Based on the foregoing, Agosti became "concerned that the propane piping behind the range in the kitchen may have been tampered with … [b]ecause it wasn't leaking" on either April 26 or April 28, 2017. N.T.,

---

[4] Agosti explained that Attorney Geci was there for the search initially on September 8, 2017, but he had left prior to the leak check. N.T, 6/20/2018, at 51.

6/20/2018, at 47. Agosti did not remove anything from the property, but "initiated a tampering with evidence investigation." Id.

Meanwhile, Attorney Geci still wanted the opportunity to explain why this was an accidental fire, and all investigating individuals and experts scheduled an appointment for September 20, 2017, where Hughes would offer his explanation. Prior to September 20, Agosti obtained "an anticipatory search warrant" in the event things did not go as planned on September 20. Id. at 49. In addition, Agosti wanted to pursue the tampering with evidence investigation and further investigate the propane leak near the range. Specifically, that warrant identified the "propane supply system" as an area to be searched. Search Warrant Authorization for 9/20/2017, at 1.

When everyone arrived on September 20, Attorney Geci informed them that Hughes would not be attending. Therefore, pursuant to the warrant, Agosti, Rich, and the others present conducted a leak check. A leak was detected "at the flexible appliance connection behind the range in the kitchen." N.T., 6/20/2018, at 52. Pursuant to the warrant, police removed the range, the tubing, and a piece of the pipe from the Property for testing.[5]

---

[5] On December 4, 2017, the ATF submitted a report identifying "several microscopic leaks in the flexible tubing" and concluded the "tubing leaks occurred as a result of fracturing." Id. at 53. Thus, it was evident the knife
(Footnote Continued Next Page)

On September 21, 2017, Agosti applied for a search warrant of Attorney Geci's office in order to obtain the Draft Report. Agosti averred the following:

> 38. [] Hughes, Hughes Engineering or his associates developed a hypothesis or an opinion indicating a propane leak occurred to cause the fire at or around the location of the kitchen range. The opinion or hypothesis was reached without completing the proper investigative steps. The fact this opinion was reached prematurely may demonstrate criminal knowledge of an intentional act designed to mislead both criminal and civil investigators. An investigation into hindering apprehension or prosecution and tampering with or fabricating physical evidence has been initiated.
>
> 39. The draft report issued may easily be destroyed or deleted prior to the conclusion of this investigation.

Affidavit of Probable Cause for Search Warrant Issued on 9/21/2018, at 8.

After obtaining the warrant, Agosti went to Attorney Geci's office. Agosti was greeted by Attorney Geci's secretary, who called Attorney Geci. Eventually, Agosti was provided a copy of the Draft Report. After reviewing the Draft Report, Agosti went to meet Hughes on September 28, 2017, as a person of interest in a tampering with evidence or hindering prosecution investigation.

At that meeting, Hughes informed Agosti that he was contacted by Attorney Geci in August of 2017 to perform a "cursory look" at the Property. N.T., 6/20/2018, at 113. Hughes had reviewed Agosti's reports prior to

(Footnote Continued) ———————————

located near the range did not cause the damage to the flexible tubing system.

examining the Property. Hughes's initial impression was that "the origin of the fire was in the kitchen" and in his opinion it was caused by gas. Id. at 115-16. Hughes emphasized that based upon Attorney Geci's request, he put very little work into the case and his draft report was "by no means done, complete, [or] definitive." Id. at 115.

Agosti applied for another search warrant on October 16, 2017, to "continue with the consideration of the propane leak." Id. at 62. Specifically, Regentin wanted to bring in an engineer who specialized in gas-related incidents. Id. During that search, Agosti collected a bean bag chair and additional carpet samples.

On December 1, 2017, Schaefer was charged with three counts of arson, theft by deception, criminal mischief, and insurance fraud.[6] A preliminary hearing was held on January 19, 2018, and at the close of the hearing, the court held all charges for trial. N.T., 1/19/2018, at 148.

On March 12, 2018, Schaefer filed his omnibus pre-trial motion. That motion included numerous requests for suppression and preclusion of evidence. Notably, it requested suppression of the Draft Report because the September 21, 2017 search "warrant was improperly issued as it illegally sought work[-]product information belonging to [Attorney Geci]." Omnibus

---

[6] Schaefer was not charged with any crimes related to tampering with evidence or hindering prosecution, based upon the results of the testing of the tubing. However, Agosti testified that the investigation into those crimes is ongoing. N.T., 6/20/2018, at 77.

Pre-Trial Motion, 3/12/2018, at ¶ 9. According to Schaefer, the improper disclosure of the Draft Report led to "[w]arrantless testing of the propane supply line for the cooking range on September 8, 2017," as well as additional pieces of physical evidence. Id. at ¶ 11. Schaefer also argued that the failure of police to secure the Property after May 5, 2017, resulted in "contamination of the alleged crime scene," and argued that all evidence gathered thereafter should be suppressed. Id. at ¶ 18. In addition, on June 8, 2018, Schaefer filed a petition for writ of habeas corpus, arguing that the Commonwealth produced insufficient admissible evidence at the preliminary hearing.

A combined hearing on both motions was held on June 20, 2018. At that hearing, the Commonwealth presented the testimony of Rich and Agosti, and Schaefer presented the testimony of Hughes. The trial court then permitted both the Commonwealth and Attorney Geci to offer closing arguments.[7] N.T., 6/20/2018, at 133. Attorney Geci requested suppression of the Draft Report and argued that Agosti has "tainted everything associated with this case" due to the seizure of the report. Id. at 136. Attorney Geci further requested suppression of testimony by "anybody that has ever seen [the Draft Report] or had anything to do with it." Id. The

---

[7] At the close of the hearing, the trial court asked the parties to submit written arguments and briefs by August 1, 2017. N.T., 6/20/2018, at 132. Attorney Geci objected to this procedure as taking too long, so no briefs were filed by either party after the hearing.

relief requested by Attorney Geci was that "all the suppression should be granted, particularly on the [Draft Report], all of the fruit of the poisonous tree, [and] the September 8 search warrant." Id. at 138. The primary focus of this argument was that it was Attorney Geci's belief that his office was illegally searched and the Draft Report was illegally seized.

In its closing argument, the Commonwealth pointed out that Schaefer's motion to suppress "is very vague and general and broad, and they're not asking for specific things." Id. at 140. The Commonwealth argued that Attorney Geci's office was searched pursuant to "a valid search warrant that was reasonable." Id. at 143. Further, the Commonwealth argued that the September 8 Leak Check was within "the scope of that … warrant." Id. at 143. The Commonwealth contended "there was nothing illegal about" the police interviewing Hughes. Id. at 144.

On July 31, 2018, the trial court entered an opinion and order, which granted Schaefer's motion to suppress in part. In particular, the trial court required the Commonwealth to "surrender all copies of the [D]raft [R]eport which was the subject of the September 21, 2017 search warrant," and precluded the Commonwealth "from cross examining [] Hughes should [] Hughes testify on behalf of [Schaefer]" at trial. Order, 7/30/2018. In addition, the trial court precluded the Commonwealth "from utilizing any information garnered from the interview of [] Hughes by the state police." Order, 7/30/2018. Furthermore, the trial court precluded "[a]ll testimony

concerning the September 8, 2017 leak test performed by" Rich and suppressed "[a]ll evidence seized from [the Property] on and after September 8, 2017." Order, 7/30/2018. All other requests made by Schaefer were either denied or deferred until trial. In addition, the trial court denied Schaefer's petition for writ of habeas corpus.

The Commonwealth timely filed a notice of appeal, and both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth challenges the trial court's suppression and preclusion of evidence. For ease of organization, we will analyze each piece of evidence that was suppressed or precluded.

Evidence Related to Hughes

We begin with the suppression of evidence related to Hughes. Here, the trial court took three actions: 1) it suppressed the Draft Report; 2) it suppressed information obtained from Hughes during Agosti's interview; and 3) it precluded the Commonwealth from cross-examining Hughes should he testify at trial.

We start with the Draft Report. See Commonwealth's Brief at 16-26. As discussed supra, the Draft Report was obtained pursuant to a search warrant issued on September 21, 2017, in furtherance of a tampering with evidence investigation related to the fact that a propane leak was found near the range several months after the fire. We consider this search, bearing the following in mind.

Because Schaefer was challenging the validity of a search warrant, our standard of review is "unique." Commonwealth v. Manuel, 194 A.3d 1076, 1080 (Pa. Super. 2018) (en banc).

> When reviewing a magistrate's decision to issue a warrant, there are no factual findings from the trial court. Thus, we need not consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Instead, we are merely reviewing the magistrate's decision to issue the warrant. As such, our duty is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

Manuel, 194 A.3d at 1080-81 (internal citations and quotation marks omitted).

> After a search warrant is issued, and the search conducted, an aggrieved defendant may file a motion to suppress evidence on the basis that the search warrant lacked probable cause. See generally Pa.R.Crim.P. 581. The burden is on the Commonwealth to show that the magistrate had a substantial basis for concluding probable cause existed. Id. at 581(H), cmt. … Rule 203(D) unequivocally states, "[a]t any hearing on a motion for the return or suppression of evidence, or for suppression of the fruits of evidence, obtained pursuant to a search warrant, no evidence shall be admissible to establish probable cause other than the affidavits provided for in [Rule 203](B)." Pa.R.Crim.P. 203(D).
>
> The Supreme Court of the United States has instructed "that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." [Illinois v.] Gates, 462 U.S. [213,] 236 [(1983)]. Indeed, a magistrate's probable cause determination should receive deference from the reviewing courts. Id. In keeping with the Fourth Amendment's strong preference for warrants, "courts should not invalidate …

warrants by interpreting affidavits in a hyper[-]technical, rather than a commonsense, manner." Id. (some brackets omitted).

Commonwealth v. Leed, 186 A.3d 405, 413 (Pa. 2018).

The trial court offered the following rationale in support of its decision that the search warrant was invalid.

> A fact which was not included in the probable cause affidavit for the September 21, 2017 search warrant nor for any other search warrants is that the police officer had failed to secure the alleged crime scene. The insurance company secured the house for 11 days after the fire after which the house was returned to the control of [Schaefer and his wife]. Initiating a hindering prosecution or tampering with or fabricating evidence investigation against [] Hughes and [Attorney] Geci, a forensic engineer and an attorney, individuals not otherwise suspected of any criminal involvement where there was no control over the crime scene[,] was highly improper. The [D]raft [R]eport sought by the police officer could not be evidence of a crime under such circumstances and it is protected from discovery by the Commonwealth for the fact that it is attorney work product.

Memorandum Opinion, 7/31/2018, at 11-12 (unnumbered).

The trial court further explained that "[t]wo critical facts [were] omitted from the search warrant application for the search of Attorney Geci's office to obtain the [D]raft [R]eport." Supplemental Opinion, 10/25/2018, at 8 (unnumbered). One fact was that the "crime scene had not been controlled for over 4 months" and therefore there could not be "a finding that someone has criminally tampered with evidence." Id. The second fact is that Agosti, who applied for the warrant, believed that Hughes is "at a minimum disreputable." Id.

Instantly, as discussed supra, the trial court concluded that the September 21, 2017 warrant was invalid because 1) it believed Agosti should have included additional facts in the affidavit of probable cause and 2) the Draft Report was attorney work product. Both conclusions were in error.

First, as set forth in Leed, supra, the role of the trial court in considering a motion to suppress evidence obtained pursuant to the execution of a search warrant is to consider the facts that were set forth in the affidavit of probable cause to determine whether, in fact, probable cause existed. Rather than doing that in this case, the trial court considered facts not included in the affidavit of probable cause to determine that probable cause did not exist.

While it is true that a "search warrant is invalid" when it is "based on an affidavit containing deliberate or knowing misstatements of material fact;" that is not the case sub judice. Commonwealth v. Ryerson, 817 A.2d 510, 514 (Pa. Super. 2003). Here, Schaefer was not challenging the veracity of the facts set forth in the affidavit of probable cause; rather, he was claiming probable cause did not exist. To determine probable cause did not exist, the trial court considered facts not included in the affidavit. That was error. See id. (holding search warrant not invalid where Ryerson was claiming facts were omitted from affidavit). Accordingly, we reverse the

portion of the trial court's order granting the motion to suppress the Draft Report.

In addition, the trial court's conclusion that the motion to suppress should be granted on the basis of the Draft Report being attorney work product was also in error. In his omnibus pre-trial motion, Schaefer argued that the Draft Report was protected and could not be discovered as attorney work product pursuant to Pa.R.Crim.P. 573(G) (providing "[d]isclosure shall not be required of legal research or of records, correspondence, reports, or memoranda to the extent that they contain the opinions, theories, or conclusions of the attorney for the Commonwealth or the attorney for the defense, or members of their legal staffs"). The trial court agreed with this concept. See Memoradum Opinion, supra. On appeal, the Commonwealth concedes that the Draft Report was attorney work product, but also argues that it was properly seized as "material evidence in an ongoing criminal investigation." Commonwealth's Brief at 17.

Attorney work product in criminal cases comes into play pursuant to rules governing discovery. The rules provide that once a criminal information is filed, both the defendant and the Commonwealth can engage in limited pre-trial discovery. See Pa.R.Crim.P. 573(A)-(C). In addition, the parties may object to such discovery by filing, inter alia, a motion for protective order. Id. at (E)-(F).

Here, the Draft Report was obtained by the Commonwealth pursuant to a search warrant executed prior to the filing of an information. Thus, we conclude that the work-product doctrine, as contemplated by the Rules of Criminal Procedure, was not at issue at that juncture, and the only issue before the trial court was whether the search warrant was valid.[8] Based on the foregoing, the trial court committed legal error in suppressing the Draft Report for the reasons it did, and we reverse this portion of the order of the trial court.[9]

We now consider whether the trial court erred in suppressing information obtained from Agosti's interview of Hughes and whether the trial court erred by precluding the Commonwealth from cross-examining Hughes should he testify at trial. Commonwealth's Brief at 26-30. The

---

[8] The Commonwealth even alludes to this concept by pointing out that even if the trial court suppresses the Draft Report on the basis of the search warrant, it would just file a motion for pre-trial discovery pursuant to Pa.R.Crim.P. 573(C)(1)(a). See Commonwealth's Brief at 23.

[9] We point out that the issue currently before us is separate from the issue of whether the Draft Report is admissible at trial. See Commonwealth v. Kennedy, 876 A.2d 939, 948-49 (Pa. 2005) ("[A] practical application of the work-product doctrine to trial in criminal proceedings prevents the Commonwealth from calling as a witness an agent who[m] the defense hired in preparation for trial but decided not to call as a witness at trial or to use the materials prepared by the agent as evidence at trial, unless the Commonwealth can show a substantial need for such testimony and an inability to obtain the substantial equivalent of such testimony without undue hardship.").

Commonwealth contends that preclusion of such cross-examination "would be a constitutional error." Commonwealth's Brief at 26.

With respect to these issues, the trial court offered the following. In concluding that the Draft Report was obtained improperly pursuant to the search warrant, the trial court fashioned the relief it felt to be appropriate under the circumstances. As discussed supra, it precluded the use of the Draft Report. Memorandum Opinion, 7/31/2018, at 12. In addition, it precluded the Commonwealth "from using any information gathered from the [Draft Report]. The Commonwealth shall be precluded from cross examination of [] Hughes should [] Hughes testify [at trial] on behalf of [Schaefer]." Id. at 13. In addition, with respect to the September 21, 2017 search warrant, the trial court precluded the Commonwealth "from utilizing any information gathered from the [D]raft [R]eport as well as the interview of [] Hughes by the state police." Id. The trial court followed up this memorandum opinion with a supplemental opinion. In that opinion, the trial court pointed out that

> police without a valid reason cannot interview a defense expert. To hold otherwise would destroy the attorney work product privilege. Here … police had no valid reason to interrogate the defense expert. [] Hughes cooperated with the police and even "voluntarily" gave them additional information beyond which they had seized at Attorney Geci's office. Such unlawful and unprofessional police conduct cannot be countenanced let alone rewarded. The least restrictive measure that [the trial court] could think of to address the situation which [the trial court has] never experienced before was to prevent the Commonwealth from cross-examining [] Hughes should the defense call him as a witness. [The trial court] thought to do less would encourage

police officers to find a reason to suspect defense experts of criminal conduct and initiate investigations to justify interrogations.

Supplemental Opinion, 10/25/2018, at 10-11 (unnumbered).

It appears that the trial court fashioned its remedy based upon two somewhat distinct bases. First, it suppressed information gathered from the interview of Hughes and precluded cross-examination of Hughes on the basis that the Commonwealth should not have obtained the Draft Report. Because the trial court did not properly analyze the validity of the search warrant, as discussed supra, this portion of the order must be reversed.

Second, to the extent the trial court fashioned this remedy due to its belief that police acted improperly by interviewing Hughes, we also reverse the order. It appears from Hughes's testimony that police informed him that he was suspected of criminal activity, then went on to question him. That may have been a violation of Hughes's rights should Hughes be charged with a crime related to tampering. However, the issue here is whether police violated Schaefer's rights. On September 28, 2017, Schaefer had not been charged with a crime. Thus, once again, the rules of discovery were not triggered. We do not know whether the action of police in questioning Hughes was common practice for police. However, we cannot agree with the trial court that the police action was either so improper or so violative of Schaefer's rights that these remedies are appropriate at this juncture. Accordingly, to the extent the trial court suppressed information gathered

from the interview with Hughes or precluded Hughes's cross-examination should he testify at trial as a violation of Schaefer's rights, that portion of the order is reversed.

September 8, 2017 Search Warrant and Search

We next consider the Commonwealth's argument that the trial court erred in precluding admission of the September 8 Leak Check performed by Rich. Commonwealth's Brief at 31-35. The Commonwealth sets forth two alternative arguments: 1) the trial court erred in precluding the results of the September 8 Leak Check because it was included within the scope of the warrant; and 2) even if the search warrant did not include checking the propane system, the September 8 Leak Check was not a search so no warrant was necessary. Commonwealth's Brief at 32.

We begin with a review of the September 8, 2017 search warrant. The authorization for the September 8, 2017 search warrant set forth the following.

> Items to be searched for and seized: Fire debris, chemicals, pesticides, flammable liquids, flammable solids, solvents, lubricants, adhesives, items which may contain naphthalene or are readily mixed with naphthalene, items that may contain petroleum distillates. Burned and unburned carpet, carpet pad, floor covering, tile, floor sheeting, wood wall and floor assemblies, kitchen countertop, residues and other materials which may have been involved with or affected by the fire.

Search Warrant Authorization, 9/8/2017, at 1.

A review of the September 8, 2017 search warrant reveals no mention of the propane system. The Commonwealth contends that the search was

within the scope of the search warrant, because it permitted search of "other materials which may have been involved with or affected by the fire." Commonwealth's Brief at 34.

However, as the trial court aptly pointed out, when Agosti wanted to search the for a propane leak, he specifically included that in the September 20, 2017 search warrant. See Memorandum Opinion, 7/31/2018, at 15-17.

> Items to be searched for and seized: Fire debris, chemicals, pesticides, flammable liquids, flammable solids, solvents, lubricants, adhesives, items which may contain naphthalene or are readily mixed with naphthalene, items that may contain petroleum distillates. Burned and unburned carpet, carpet pad, floor covering, tile, floor sheeting, wood wall and floor assemblies, kitchen countertop, residues and other materials which may have been involved with or affected by the fire. **Propane supply system, connections, joints, regulators, propane appliances, any material transporting or regulating propane. Tools or implements capable of puncturing supply lines or loosening connections.**

Search Warrant Authorization, 9/20/2017, at 1 (emphasis added).

Thus, the Commonwealth's argument at this juncture appears to us an attempt to back door the leak check into the meaning of the warrant.[10] The

---

[10] Moreover, Agosti had the opportunity to obtain a new or amended search warrant prior to the September 8 Leak Check. Agosti took the time to request that Rich come to the Property; he could have also taken the time to ensure the search warrant included a reference to the leak. See also Supplemental Opinion, 10/25/2018, at 5 ("After receiving information from Attorney Geci on the morning of September 8, 2017[, Agosti] did not take the time to amend the application for [the] search warrant even though there was no urgency to act without doing so.").

September 8, 2017 search warrant clearly did not authorize the search of the propane system that day.

In the alternative, on appeal, the Commonwealth argues that Schaefer "did not have expectation of privacy in the air, propane and/or propane leak within [Schaefer's] residence." Commonwealth's Brief at 33. According to the Commonwealth, once Attorney Geci informed Agosti there might be a propane leak, there was "inherent danger" and "as a matter of public policy" Agosti could check for the leak. Id. Accordingly, the Commonwealth requests that we reverse the order on this basis.

Our review of the record reveals that the Commonwealth did not argue this theory at the hearing. It argued only that the September 8 Leak Check was within the scope of the search warrant. N.T., 6/20/2018, at 143. It is well-settled that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Accordingly, we conclude that this issue is waived, and we will not reverse this portion of the order on this basis. Therefore, we conclude that the September 8 Leak Check was in violation of Schaefer's rights; accordingly, we must evaluate whether the trial court's exclusion of this evidence was proper.

> Pursuant to the so-called exclusionary rule, [e]vidence discovered as a result of a search that violates the fundamental constitutional guarantees of Article I, Section 8 will be suppressed. Thus, it is important to distinguish between a violation of the fundamental constitutional guarantees of Article I, Section 8 and mere technical noncompliance with the

Pennsylvania Rules of Criminal Procedure. We have, in fact, specifically reject[ed] the automatic application of the exclusionary rule to suppress evidence seized pursuant to a search which in some way violates the Pennsylvania Rules of Criminal Procedure relating to the issuance and execution of search warrants. Indeed, it is only when violations of the Rules assume constitutional dimensions and/or substantially prejudice the accused that suppression may be necessary.

Commonwealth v. Ruey, 892 A.2d 802, 808 (Pa. 2006) (internal citations and quotation marks omitted).

"In a private home, searches and seizures without a warrant are presumptively unreasonable.... Absent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the Fourth Amendment." Commonwealth v. Roland, 637 A.2d 269, 270 (Pa. 1994) (internal citation and quotation marks omitted). "When an official search is properly authorized[,] the scope of the search is limited by the terms of its authorization." Commonwealth v. Parker, 619 A.2d 735, 740 (Pa. Super. 1993).

Here, because we concluded that Agosti performed a search of Schaefer's home that went beyond the scope of the warrant that was issued, we also conclude Schaefer's constitutional rights were violated. Thus, the trial court did not err in excluding evidence obtained from the September 8

Leak Check pursuant to the exclusionary rule, and we affirm this portion of the trial court's order.[11]

In summary, we reverse the portion of the trial court order granting the motion to suppress with respect to all evidence related to the Draft Report and Hughes. We affirm the order in all other respects.

Order affirmed in part and reversed in part. Jurisdiction relinquished.

---

[11] There was also some confusion about what evidence was excluded by the trial court's order. According to the Commonwealth, the trial court's order suppressed evidence that was not related to the leak check and therefore was lawfully obtained pursuant to the September 8, 2017 search warrant. See Commonwealth's Brief at 31 (pointing to "wood from the stairway" area, carpet and carpet pad samples, and upholstery from a living room chair). The Commonwealth contends that this evidence was not "fruit of the poisonous tree." See, e.g., Commonwealth v. Johnson, 68 A.3d 930, 946 (Pa. Super. 2013) ("The 'fruit of the poisonous tree' doctrine excludes evidence obtained from, or acquired as a consequence of, lawless official acts."). Our review of the trial court's order and opinion indeed reveals a discrepancy. The trial court order states that "[a]ll evidence seized from [the Property] on and after September 8, 2017 is suppressed." Trial Court Order, 7/31/2018 (emphasis in original). However, in the memorandum opinion accompanying that order, it refers only to "information illegally obtained on September 8, 2017" as being suppressed. Memorandum Opinion, 7/31/2018, at 17. We read these parts together and conclude that evidence that was lawfully seized on September 8, 2017, namely those items set forth in the search warrant and referenced by the Commonwealth, was not suppressed by the trial court. Accordingly, there is no relief we must provide to the Commonwealth on this argument.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 5/21/2019